UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WISCONSIN

PARAGON COMPONENT SYSTEMS, LLC,

Plaintiff,

v.

Case No. 3:25-cv-00170-wmc

QUALTIM INC., CENTER FOR BUILDING
INNOVATION LLC, DRJ ENGINEERING LLC,
INSPIRED PURSUITS LLC, KIRK GRUNDAHL,
and SUZANNE GRUNDAHL,

Defendants.

## DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

### INTRODUCTION

Paragon asks the Court to declare that it alone owns the intellectual property in the Paragon Truss Software—every copyright, every trade secret, every trademark, and any patent that may someday issue. The record that defeats that request is largely Paragon's own.

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████████████████ █████ -which appears in that field more often than any single provision of ANSI/TPI 1. Its developers wrote in the source code that

██████████████████████████████████████████████████████

████████████████████████████████████ Its founder proposed protection for innovations ███████████████████ and for eight years the drawings the software produced ████████████████

Fourteen days after Paragon received a Qualtim Companies' memorandum asserting joint ownership, ███████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████████████████████████████████████

No one disputes that Paragon's personnel wrote the code. Paragon also concedes that it "does not provide engineering services." What is disputed is who supplied the engineering that code applies, and what follows from the parties' relationship.

Each claim fails on this record. Copyright ownership turns on authorship and intent, both disputed and both documented in Paragon's files. The trade secret claim fails at the threshold, because Paragon has never identified the secret it says it owns. Trademark ownership depends on whose enterprise generated the goodwill, which is contested. And no patent or patent application exists—there is nothing to declare. The motion should be denied.

## ARGUMENT

### I. THE TENNESSEE JURISDICTIONAL STATEMENT DOES NOT ENTITLE PARAGON TO SUMMARY JUDGMENT.

#### A. Judicial Estoppel Fails Because No Court Accepted the Purported Prior Position.

Judicial estoppel applies only if the prior position was accepted by a court. Without judicial acceptance, the doctrine does not apply. *New Hampshire v. Maine*, 532 U.S. 742, 750–51 (2001). Paragon's own authorities recognize the same requirement. *Kale v. Obuchowski*, 985 F.2d 360, 361–62 (7th Cir. 1993); *In re Cassidy*, 892 F.2d 637, 641 (7th Cir. 1990); *In re Airadigm Commc'ns, Inc.*, 616 F.3d 642, 662 (7th Cir. 2010).

Paragon's estoppel argument turns on a single sentence from Defendants' December 2024 reply supporting dismissal of the Tennessee action for lack of personal jurisdiction. (Dkt. 209/210 at 9–16.) In opposing dismissal, Paragon treated the Defendants collectively as "Qualtim and

2

Affiliates" and argued that their asserted co-ownership established Tennessee contacts. (Dkt. 51 at 3 n.1, 13.) Defendants' reply responded to that argument by disaggregating the parties. Two consecutive sentences make the point: "Qualtim already agrees with Paragon's contention that Qualtim and its family of businesses do not co-own the Paragon software. Inspired Pursuits, LLC is claiming ownership rights in the Paragon software, not Qualtim and its family of businesses." (Dkt. 54 at 1.) Paragon quotes the first sentence and omits the second. The reply therefore addressed which Defendant's asserted ownership claim was relevant to personal jurisdiction—not the ultimate merits of copyright ownership.

The Tennessee court never accepted any ownership position. It decided only personal jurisdiction and expressly assumed the parties' factual assertions solely for purposes of that analysis. (Dkt. 73 at 4, 6, 10 n.7, 12 & n.8.) After transfer, this Court likewise declined to decide ownership, recognizing that co-ownership remained disputed. (Dkt. 179 at 1, 3–4, 8.) A jurisdictional ruling concerning whose contacts matter is not adoption of a merits determination that no Defendant co-owns the software. Judicial estoppel applies only to a position the court actually adopted or endorsed, and Paragon has not made that showing. *Commonwealth Ins. Co. v. Titan Tire Corp.*, 398 F.3d 879, 887 (7th Cir. 2004).

Paragon's argument also fails because the statements it characterizes as inconsistent are entirely consistent once the Copyright Act's ownership rules are applied.

Since 2017, Daniel Holland and the Grundahls intended Inspired Pursuits to hold the Enterprise's intellectual property, but no signed writing completed that transfer. (K. Grundahl Decl. ¶¶ 29, 102.) Under the Copyright Act, copyright ownership cannot transfer without a signed writing; thus authorship and co-ownership remained by law with the operating companies that created the copyrightable contributions—the Qualtim Companies. 17 U.S.C. §§ 201(a), 204(a).

3

Read in that framework, Defendants' statements are consistent: Inspired Pursuits was the intended holder, while the operating companies retained ownership because no transfer ever occurred. Paragon's theories depend on isolating statements from that structure.

Paragon's reading also defeats itself. Its Complaint shows that Paragon sued each Defendant because it believed each claimed ownership: Defendants "contend that they are co-owners," and Grundahl "began claiming that he and some, or all, of the other Defendants co-own" the software. (Dkt. 1 ¶¶ 1, 6.) The Complaint identifies Inspired Pursuits as the entity Grundahl said "has [an] ownership interest," while alleging it "has had no connection to or involvement with Paragon's software development." (Dkt. 1 ¶ 5.) Paragon's jurisdictional theory therefore depended on Defendants' asserted Tennessee-directed co-ownership. Having sued Defendants for asserting ownership, Paragon cannot now recast the same record as an admission that they assert none without undermining its own opposition.

The pre-litigation business correspondence likewise confirms Defendants' consistent position. Before Paragon filed suit, Kirk Grundahl—Qualtim's president and an Inspired Pursuits manager—stated ███████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

██████████████ (Dkt. 1-15, App. A ¶ 4.) The letters therefore did not disclaim the operating companies' ownership; they reflected the same ownership structure Defendants assert here. Statement made before litigation cannot constitute the type of clear, unequivocal inconsistency required for judicial estoppel.

Paragon's fallback argument fares no better. Unable to satisfy the elements of judicial estoppel, it repackages the same statements as binding judicial admissions.

4

### B.    The Statement Is Not a Judicial Admission of Fact.

Paragon next recasts the same sentence and Defendants' discovery responses as binding judicial admissions. (Dkt. 209/210 at 16–17.) That argument fails for two independent reasons.

*First*, a judicial admission must be a deliberate, clear, and unequivocal concession of fact—not a disputed legal conclusion. *Pierce v. City of Chicago*, No. 09-cv-1462, 2012 U.S. Dist. LEXIS 14331, at \*13–14 (N.D. Ill. Feb. 7, 2012); *see also McCaskill v. SCI Mgmt. Corp.*, 298 F.3d 677, 680 (7th Cir. 2002); *Keller v. United States*, 58 F.3d 1194, 1198 n.8 (7th Cir. 1995). Whether parties are co-owners under the Copyright Act requires applying the Act's joint-work, vesting, and writing provisions to disputed facts, as Paragon's own reliance on *Community for Creative Non-Violence v. Reid*, 490 U.S. 730 (1989), and 17 U.S.C. §§ 201(a), 204(a), confirms. Paragon's own authority recognizes the same distinction: *Pierce* treated as binding a factual statement about who performed particular acts—not a legal characterization of ownership. *Pierce v. City of Chicago*, 2012 U.S. Dist. LEXIS 14331, at \*13–14 (N.D. Ill. Feb. 7, 2012).

*Second*, none of the statements Paragon identifies constitutes the clear and unequivocal concession the doctrine requires.

The Tennessee reply must be read as a whole. It defined "IP-LLC" to mean Defendants collectively unless a specific Defendant was identified. (Dkt. 54 at 1.) The same reply that stated Qualtim did not co-own the software also stated that the software "contained IP-LLC [i.e., Defendants] intellectual property, DrJ professional engineering knowledge.., and DrJ copyrighted truss designs." (*Id.* at 19.) Read in context, the reply addressed personal jurisdiction, not the ultimate merits of copyright ownership. It therefore contains jurisdictional characterizations, not the deliberate and unequivocal factual concession required for a judicial admission.

The pre-litigation correspondence fares no better. Kirk Grundahl's May and June 2024 business letters predated this litigation, and judicial admissions arise from formal pleadings,

5

stipulations, or comparable litigation concessions. *Keller*, 58 F.3d at 1198 n.8. Paragon itself recognized as much. Its counsel wrote that Paragon had not "stipulated" to any of Grundahl's statements, characterizing them as "Qualtim's current assertions." (Dkt. 1-14.) Having rejected those assertions when made, Paragon cannot now transform them into binding judicial admissions.

Nor do Defendants' discovery responses support Paragon's position. The May 14, 2025 supplemental response ███████ ████ ██████████ ████ ████ ██

████████████████████████████████████████

████████████████████████████████████████

██████████████████ (Steelman Decl. Ex. 20 at 1 ¶ 1.) The December 31, 2025 supplemental response explained why: Kirk Grundahl and his companies ████████████

████████ of their copyrightable contributions because the software was to be held for the benefit of IP-LLC only after transfer documents were executed, but they never were. So IP-LLC holds only a beneficial interest, not exclusive legal title. (Steelman Decl. Ex. 22 at 4 ¶ 3.)

Finally, Inspired Pursuits' Rule 30(b)(6) testimony is equally consistent with that

████████████████████████████████████████

████████████████████████████████████████

8, IP-LLC Dep. 204:1–15); ██████████████████████████████

████████████████████████████████████████

████████████████████████████████ (*Id.* at 204:5–

15; see also id. 207–209.) That testimony mirrors Defendants' position throughout this litigation. Because no signed assignment satisfying § 204(a) was ever executed, legal ownership remained with the Qualtim Companies notwithstanding the parties' intent that Inspired Pursuits ultimately hold the copyrights. 17 U.S.C. §§ 201(a), 204(a). The lone statement identifying Paragon as the

6

"sole owner" was elicited through a deposition question, immediately corrected during the examination, and formally corrected by errata. (*Id.* 304–307 & Errata.)

## II. GENUINE DISPUTES OF MATERIAL FACT PRECLUDE SUMMARY JUDGMENT ON THE JOINT VENTURE ENTERPRISE.

### A. Paragon's Motion Reaches Two Counts Not Dependent on a Joint Venture.

Paragon assumes all three counterclaims depend on Wisconsin joint-venture law. They do not. Count I seeks a declaration of joint copyright ownership, and Count II seeks the accounting owed to a copyright co-owner. Both arise under the Copyright Act, which Paragon itself concedes. (Dkt. 178 ¶¶ 68–97; Dkt. 209/210 at 49.) Only Count III depends on the Enterprise. And because Counts I and II do not require a joint venture for reasons explained in Argument III, Paragon's joint-venture argument cannot support judgment on those counts.

The Enterprise evidence nevertheless remains highly relevant to Count I—not because a joint venture is an element of copyright ownership, but because it is compelling evidence of the parties' intent to create a joint work.

### B. Paragon Misstates Wisconsin Law, and Genuine Disputes of Material Fact Preclude Summary Judgment.

Daniel Holland described the Enterprise as standing on three interdependent legs. The Qualtim Companies supplied the professional engineering and ISO/IEC 17025-accredited testing the software required; Paragon, formed in 2016 by the Enterprise's other principal, wrote the software; and Clearspan manufactured trusses from the sealed engineering output. (K. Grundahl Decl. ¶¶ 5–8, 11, 13, 27; Vogt Decl. ¶ 16–17, 27; S. Grundahl Decl. ¶¶ 6–8.) None could function independently. Without engineering, Paragon had nothing to code. Without an engineer's seal, Clearspan had nothing it could lawfully manufacture. Without Clearspan, there was no commercial product to sell.

Daniel Holland and the Grundahls were the Enterprise's principals. They formed Inspired Pursuits, LLC to hold the Enterprise's intellectual property—including testing records, engineering materials, software, and product designs. (K. Grundahl Decl. ¶¶ 8, 16, 62; S. Grundahl Decl. ¶¶ 4, 10–12, 14, 16.) Paragon nevertheless portrays the Qualtim Companies as outside vendors and asks the Court to disregard fifteen years of shared investment, a jointly owned intellectual-property holding company, biweekly engineering meetings, more than 300,000 pages

████████████████████████████████████████████████████

enterprise, not an ordinary vendor relationship.

Wisconsin asks whether four elements support a joint venture: (1) contributions of money or services, "but not necessarily in equal proportion"; (2) joint proprietorship and mutual control; (3) an agreement to share profits, "though not necessarily the losses"; and (4) an express or implied contract. *Edlebeck v. Hooten*, 20 Wis. 2d 83, 88, 121 N.W.2d 240 (1963); *Ruppa v. Am. States Ins. Co.*, 91 Wis. 2d 628, 645, 284 N.W.2d 318 (1979); *Troy Co. v. Perry*, 68 Wis. 2d 170, 176–77, 228 N.W.2d 169 (1975). Paragon's contention that Wisconsin requires an agreement to share both "Profits and Losses" imports an Illinois element from *Trustmark Insurance Co. v. General & Cologne Life Re of America*, 424 F.3d 542, 546 (7th Cir. 2005). (Dkt. 209/210 at 40.) Wisconsin requires contribution toward a common commercial objective, joint ownership and control, and an agreement to share profits, but not necessarily losses. *Sussmann v. Gleisner*, 80 Wis. 2d 435, 444, 259 N.W.2d 114, 118 (1977); *Bulgrin v. Madison Gas & Elec. Co.*, 125 Wis. 2d 405, 412, 373 N.W.2d 47, 52 (Ct. App. 1985).

Wisconsin likewise treats a joint venture as a form of partnership. "In the absence of an express agreement the laws relating to partnerships apply to joint ventures." *Wolosek v. Wolosek*, 2003 WI App 244, ¶ 11, 268 Wis. 2d 294, 671 N.W.2d 864 (citation omitted). *Wolosek* further

8

demonstrates that a joint venture need not be confined to a single transaction; it involved a multi-year farming enterprise wound up under Wisconsin's partnership statutes. *Id.* ¶¶ 2, 6, 16. Count III alleges that type of undertaking—a partnership formed to commercialize the platform, not a partnership at will that any participant could dissolve before the venture achieved its purpose. (Dkt. 178 ¶¶ 99–100.) That purpose was never accomplished because Paragon terminated the Enterprise just as the platform was prepared for launch in early 2024. (K. Grundahl Decl. ¶¶ 28, 30, 61, 92.) Abandoning a partnership by express will before completion of a particular undertaking is wrongful dissociation, which subjects the dissociating partner to damages in addition to all wind-up and distribution obligations. Wis. Stat. § 178.0602(2)(b)1., (3). And after Daniel Holland's death, dissolution required the consent of at least half the remaining partners within ninety days; none was given. § 178.0801(2)(a). Chapter 178 therefore supplies the wind-up and distribution relief Count III seeks. § 178.0802(2)(a); (Dkt. 178 ¶¶ 103–105.)

Summary judgment is unavailable because genuine disputes exist as to every material element of the Enterprise. The parties dispute the nature and extent of their respective contributions, whether they jointly exercised ownership and control, whether they agreed to share profits, and whether their conduct created an implied joint-venture agreement. Those disputes are supported by years of documentary evidence, declarations, financial records, business records, engineering records, and extensive communications. Paragon does not address the contribution element at all.

Wisconsin authority confirms that these issues belong to the factfinder. In *Jolin v. Oster*, the Wisconsin Supreme Court reversed the trial court's refusal to submit a joint-venture question to the jury; the jury later found a joint venture and awarded $161,000. 44 Wis. 2d 623, 632–33, 172 N.W.2d 12 (1969); 55 Wis. 2d 199, 198 N.W.2d 639, 644–46 (1972). Paragon's own authority

9

likewise recognizes that summary judgment is inappropriate whenever a genuine dispute exists regarding any joint-venture element. *Servicios Especiales Al Comercio Exterior v. Johnson Controls, Inc.*, 791 F. Supp. 2d 626, 635 (E.D. Wis. 2011). And where, as here, the issues are fact-intensive, intertwined, and trial is imminent, summary judgment is a poor substitute for a trial. *Kennedy v. Silas Mason Co.*, 334 U.S. 249, 256–57 (1948).

Nor do the Wisconsin cases on which Paragon relies resemble this record. *Edlebeck* involved four brothers returning from a recreational deer hunt; because a joint venture must be commercial, the court observed that a different question might be presented had the trip involved "commercial hunting for meat and profit." 20 Wis. 2d at 88–89. *Ruppa* involved a nonprofit saddle club whose proceeds were devoted to charity or future horse shows, making profit sharing legally impossible. 91 Wis. 2d at 645–46. And in Fail-Safe, the purported joint venture rested on only "ten to fifteen conversations" and "numerous letters," which established, "at best," that one party had been retained to produce a pool-pump motor. *Fail-Safe LLC v. A.O. Smith Corp.*, 744 F. Supp. 2d 831, 861 (E.D. Wis. 2010). This Enterprise was neither recreational nor charitable, and this record consists of far more than a handful of conversations or letters. The parties jointly built and operated a long-term commercial enterprise to develop, commercialize, and profit from the Paragon platform.

## C.   The Record Supports Each Element.

### 1.   Each Party Contributed Money or Services.

Paragon does not dispute this element, and the record overwhelmingly establishes it. From 2009 through 2024, the Qualtim Companies contributed the professional engineering, engineering analyses, workbooks, worked examples, testing records, and engineering specifications that enabled development of the Paragon software, frequently at reduced rates or on deferred-

10

36, 180; Vogt Decl. ¶¶ 30, 39–45, 53; S. Grundahl Decl. ¶ 9.) Their personnel devoted approximately 8,000 uncompensated hours to the Enterprise. (S. Grundahl Decl. ¶¶ 18–21.) Qualtim's testing facility, CBI, separately funded and conducted the ISO/IEC 17025-accredited plate-testing program that generated the proprietary testing data incorporated into the software. (K. Grundahl Decl. ¶¶ 17, 108.) Inspired Pursuits' members also funded equipment, prototype, and die-testing expenses in proportion to their ownership interests. (S. Grundahl Decl. ¶ 16.)

The remaining Enterprise participants likewise made substantial contributions. Paragon contributed the software code, while Clearspan contributed manufacturing operations and financed

███████████████████████████████████████████████████████████

that each participant contribute money or services toward the common enterprise; those contributions need not be equal. *Sussmann v. Gleisner*, 80 Wis. 2d 435, 444, 259 N.W.2d 114, 118 (1977). On this record, no reasonable dispute exists that each participant made substantial contributions to the Enterprise.

### 2.    Joint Proprietorship and Mutual Control.

Paragon argues that mutual control exists only if each participant can "force the other" to enter transactions or "compel the use of each other's employees or resources." (Dkt. 209/210 at 43.) That is not Wisconsin law. Paragon derives that standard from *Trustmark*, 424 F.3d at 546, which applied Illinois law. Wisconsin instead asks whether the participants possessed "an equal right to a voice in the direction of the enterprise." (Dkt. 209/210 at 39–40.) Control "need not be shared equally between members of a joint venture but may be delegated to one member." *Bulgrin v. Madison Gas & Elec. Co.*, 125 Wis. 2d 405, 411, 373 N.W.2d 47, 51 (Ct. App. 1985).

The record easily satisfies that standard. The Enterprise deliberately divided authority according to each participant's expertise. Paragon wrote software. The Qualtim Companies exercised authority over the engineering used in the software and over the sealed engineering

11

output. Clearspan manufactured trusses from those sealed designs. (K. Grundahl Decl. ¶¶ 4, 5–13, 27; Vogt Decl. ¶¶ 27, 30, 54–55; S. Grundahl Decl. ¶¶ 6–8.) That allocation of responsibility reflects coordinated management of a common enterprise—not an ordinary vendor relationship.

The evidence of shared control is substantial. The Qualtim Companies had final authority over the engineering embodied in the software used to produce sealed truss designs, and Paragon did not release engineering changes that the Qualtim engineers had not approved. (K. Grundahl Decl. ¶ 4.) As retired DrJ engineer James Vogt explains, the engineers "held a firm line on the engineering," and "[w]hen the program produced a result the engineering did not support, we identified it and Paragon corrected the code." (Vogt Decl. ¶ 54.) The mechanism was concrete: Joe Michels, P.E., ██████████████████████████████████████████████████████████

████████████████████████████████████████████████ and "[w]here the results did not match, we identified what was wrong, and Paragon corrected its code based on the engineering we provided." (Vogt Decl. ¶ 41.) Because DrJ's engineers were professionally licensed, they could not seal designs generated by software unless the underlying engineering satisfied their professional standards. (*Id.* ¶ 55.)

Paragon's own development records corroborate that testimony. Developers implemented DrJ's engineering specifications, held software changes until Keith Hershey and Kirk Grundahl approved them, modified outputs ███████████████ distinguished changes requiring DrJ approval from those that did not, and recorded others as ███████████████████████████ (K. Grundahl ¶¶ 68, 79.) The software itself reflected the same allocation of authority, labeling engineering checks ████████████████████████████████████████████████████████

████████████████ The direction ran in that order. On September 13, 2018, Paragon's developer asked DrJ whether Paragon "should implement the different-depth calculation" for stacked chords;

Vogt answered that it should, and DrJ's Ryan Dexter confirmed the decision. (Vogt Decl. ¶¶ 48–49 & Exs. 6–7; K. Grundahl Decl. ¶¶ 79, 81–83, 87, 90, 111, 164.) Paragon would even share the source code with Qualtim when questions arose. (Salemi Decl. Ex. 3, Hershey Dep., June 2, 2026, at 269:19–272:1.)

Joint proprietorship is likewise supported by extensive evidence. Daniel Holland and the Grundahls formed Inspired Pursuits in 2017 to hold the Enterprise's intellectual property and reorganized it in Wisconsin in 2022 with Holland holding a fifty-percent interest and the Grundahls

██████████████████████████████████████████████████

██████████████████████████████████████████████████

¶¶ 10–17.) The organizational structure Daniel Holland requested, reviewed, and revised identified

██████████████████████████████████████████████████

██████████████████████████████████████████████████

materials provided to both Daniel and John Holland, including one stating tha█████████████████

█████████████████████████████████████ Neither Daniel nor John Holland ever objected to that structure or asserted that Paragon alone owned the software. (K. Grundahl Decl. ¶¶ 18–20, 29; S. Grundahl Decl. ¶¶ 13–14.)

Wisconsin precedent recognizes precisely this type of shared enterprise. In *Bulgrin*, the court held that a prima facie joint venture existed even though two of the three participants had delegated day-to-day supervision to the third. 125 Wis. 2d at 411–12. Likewise, in *Spearing v. County of Bayfield*, two separate companies combined different components into a single commercial product—the crane in Canada and the chassis in the United States—under an agreement the court found "implied if not express." 133 Wis. 2d 165, 173–74, 394 N.W.2d 761, 765 (Ct. App. 1986). Joint control existed because the companies acted as one in marketing and

13

engineering decisions passed between them. *Id.* Engineering authority flowing from one participant to another therefore demonstrated joint control rather than a vendor relationship. The same inference is available here.

Paragon's contrary arguments create, at most, factual disputes. It first relies on Kirk Grundahl's testimony that Paragon had "no reason" to direct the Qualtim Companies' employees. But that follows directly from Paragon's own position that it employed no engineers and "does not provide engineering services." (Holland Decl. ¶ 55; K. Grundahl Decl. ¶¶ 11–12.) The testimony therefore confirms that engineering authority rested with the Qualtim Companies; it does not negate shared control over the Enterprise.

Paragon next relies on John Holland's declaration that Daniel Holland lacked authority to bind Paragon without John's approval. The Grundahls testify otherwise. They dealt with Daniel Holland as the individual acting on behalf of both Clearspan and Paragon, were never shown Paragon's Operating Agreement, and were never told Daniel's authority was limited. (K. Grundahl Decl. ¶ 10; S. Grundahl Decl. ¶ 3.) John Holland's own contemporaneous statements support that understanding. He referred to ███████████████████████████████████████████

██████████████████████████ (K. Grundahl Decl. ¶¶ 47, 48, 63.)

Even if Daniel Holland's authority were disputed, Paragon ratified his conduct. A corporation "cannot enjoy the benefits of a transaction and repudiate its responsibilities"; acceptance of those benefits constitutes ratification. *Lyons v. Menominee Enterprises, Inc.*, 67 Wis. 2d 504, 511 & n.14–16, 19, 227 N.W.2d 108 (1975). When a corporation knowingly acquiesces in its president's conduct, it is bound as though the authority had been expressly conferred, and third parties need not demand a board resolution before relying on that authority. *Id.* at 511–12 & n.14–15, 19. For years Paragon accepted the engineering, the professionally sealed truss designs,

14

DrJ's copyright notice on the drawings generated by its software, and software that identified its ██████████████████████████ while John Holland participated in the Enterprise. (K. Grundahl Decl. ¶ 9.) After eight years and more than 300,000 pages of shared communications, Paragon cannot retain those benefits while disclaiming the authority through which they were obtained.

### 3.    An Agreement to Share Profits—and, if Required, Losses.

Paragon's argument depends on treating Clearspan as both inside and outside the Enterprise. Clearspan and Paragon are defendants in the related '75 Action scheduled for a consolidated December 2026 trial. Yet Paragon now characterizes Clearspan as a stranger to the

████████████████████████████████████████████████████

(Dkt. 209/210 at 40–41.) At the same time, however, Paragon claims that same payment as compensation it supposedly made to the Qualtim Companies for engineering services. Because if not, it has no evidence that Paragon compensated them for years of engineering work. (Pl.'s PFOF ¶ 78.) It cannot have it both ways.

Paragon's own filings illustrate the contradiction. Its Complaint twice alleged that Paragon paid the Qualtim Companies hundreds of thousands of dollars for DrJ's consulting services. (Dkt.

████████████████████████████████████████████████████

Decl. Ex. 12.) Its proposed findings do the same. It offers the invoice title, "Consulting re: Paragon Software Development," and asserts that "Qualtim was compensated for the consulting services and engineering support provided to Paragon." (Pl.'s PFOF ¶¶ 76, 78.) Fourteen findings later it

████████████████████████████████████████████████████

and says it came from Clearspan. (Pl.'s PFOF ¶ 90.) The check itself was drawn on Clearspan and bears the notation ████████████████████████ (Holland Decl. Ex. 12.)

████████████████████████████████████████████████████

payment plus invoices relating to Adam Heise's user-interface testing. Heise was a truss-design

15

technician—not an engineer—retained after Daniel Holland requested end-user testing of the software. (Dkt. 51-1 ¶ 15; Pl.'s PFOF ¶¶ 79–80; K. Grundahl Decl. ¶ 23; S. Grundahl Decl. ¶ 25.) And Paragon failed to pay three of those invoices—for Mr. Heise's work in February, March, and

<span style="background:black"> </span>

period Paragon says it paid in full. (Pl.'s PFOF ¶ 80.)

The record supports a different inference. Daniel Holland directed both the Qualtim Companies and Paragon to invoice Clearspan because the Enterprise had experienced "such a

<span style="background:black"> </span>

Decl. Ex. 1, Eason Dep., May 11, 2026, at 166:23–170:13.) Clearspan only knows what

<span style="background:black"> </span>

invoice at Daniel Holland's direction, explains that the Enterprise originally operated on a roughly

<span style="background:black"> </span>

compensated fairly." Daniel Holland instructed her to submit a non-round amount using the description he requested. (S. Grundahl Decl. ¶¶ 23–24.) On that record the payment reflects the

<span style="background:black"> </span>

the Qualtim Companies and Paragon. (K. Grundahl Decl. ¶ 21.) DrJ likewise paid Paragon between

<span style="background:black"> </span>

costs within the Enterprise. (*Id.* ¶ 13.) Defendants' discovery responses likewise identify the

█████████████████████████████████████████████████████████████████████████████

entities" as confidential Enterprise information—responses Paragon itself placed before the Court.

█████████████████████████████████████████████████████████████████████████████

The absence of a finalized percentage does not defeat the element. Wisconsin requires an agreement to share profits, not a fixed allocation formula, and contributions need not be equal. *Edlebeck v. Hooten*, 20 Wis. 2d 83, 88, 121 N.W.2d 240 (1963); *Ruppa v. Am. States Ins. Co.*, 91 Wis. 2d 628, 645, 284 N.W.2d 318 (1979). The Enterprise ended just as commercialization began, before the participants reduced the allocation to a signed writing. Meanwhile, they continued to negotiate how their interests would be reflected. At a May 2020 meeting attended by John Holland, Daniel Holland proposed converting Paragon's debt to DrJ and Qualtim into an equity instrument.

█████████████████████████████████████████████████████████████████████████████

Grundahl Decl. ¶¶ 45, 54.) Those discussions are consistent with an enterprise still finalizing how future profits would be allocated—not with the absence of any agreement to share them.

Even if Wisconsin required proof of shared losses, the record contains that evidence as

█████████████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████████████

Decl. ¶ 6 & Ex. 156; Steelman Decl. Ex. 19 ¶ 17.) Cost sharing is loss sharing before profits exist, and Paragon does not dispute that the arrangement existed—only that it reached Paragon. (Dkt. 209/210 at 41.) Inspired Pursuits' members also funded Enterprise expenses in proportion to their ownership interests. (S. Grundahl Decl. ¶ 16.) Daniel Holland financed Paragon through Clearspan

█████████████████████████████████████████████████████████████████████████████

absorbed engineering and ISO/IEC 17025 testing costs, shared Adam Heise's reduced-rate testing

17

expenses, and contributed approximately 8,000 uncompensated hours. (K. Grundahl Decl. ¶¶ 9, 17, 23, 52; S. Grundahl Decl. ¶¶ 18–21, 25–26.)

Wisconsin recognizes that uncompensated labor may itself constitute a capital contribution rather than wages. In *Wolosek*, the court found it significant that the alleged venturer "received no wage or compensation for his services, as would an employee," making it unreasonable to conclude that he "agreed to work free of charge…without an interest in the profits." 2003 WI App 244, ¶¶ 7, 13. The Qualtim Companies' thousands of uncompensated engineering hours are the same type of unreimbursed capital contribution. Under Wis. Stat. § 178.0806(2)(a), those contributions must be valued and returned before any surplus is distributed. (Dkt. 178 ¶ 104.)

### 4.    An Express or Implied Contract.

Paragon argues that Defendants rely only on a "course of dealing" and "coordinated business activities," which it says cannot establish an implied agreement. (Dkt. 209/210 at 48.) Wisconsin law says the opposite. An implied-in-fact contract requires the same mutual assent as an express contract; it differs only in the manner of proof. The agreement may be established through the parties' words, conduct, and course of dealing, viewed objectively through their external manifestations of intent. *Theuerkauf v. Sutton*, 102 Wis. 2d 176, 183, 186, 306 N.W.2d 651 (1981). That principle applies equally to joint ventures. In *Spearing*, the agreement was "implied if not express." 133 Wis. 2d at 173. In *Wolosek*, the venture operated without any written agreement at all. 2003 WI App 244, ¶ 2.

Measured by that objective standard, the record readily supports an implied agreement. For approximately fifteen years, the participants acted as a single commercial enterprise. They met regularly—including approximately five years of bi-weekly engineering meetings—worked through shared Slack channels comprising more than 300,000 pages of communications, jointly

18

████████████████████████████████████████████████████████

Vogt Decl. ¶¶ 27–30.)

Their contemporaneous descriptions matched their conduct. Daniel Holland described the arrangement as reciprocal rather than arm's length: "half the time Paragon is acting as the customer of the consulting and half the time they're acting as the vendor of the sealing product and…the DrJ's guy is the same way that sometimes they're offering help on the analysis and sometimes they're acting like the customer wanting changes to the sealing program." (K. Grundahl Decl. Ex. 12, Transcript Excerpt F at 19.) Daniel Holland stated that ███████████████████████████ ██████████████ and that █████████████████████████████████████████████ ██████████ (K. Grundahl Decl. ¶¶ 42–43.) Kirk Grundahl told Daniel and John Holland in May 2020 that ████████████████████████████████████████ and that ████████████ █████████████████████████████████████████████ Daniel Holland answered: "I████ ████████████████████████████████████████████████████ ██████████████ (*Id.* ¶ 45.) John Holland likewise referred to ██████████████████████ ██████████████████ (*Id.* ¶¶ 48, 53; *see also* Vogt Decl. ¶ 27.) Those are the objective manifestations of an agreement to operate a joint commercial enterprise.

Paragon's reliance on *Studio & Partners, s.r.l. v. KI* is misplaced. There, the plaintiff relied on "a few meetings and letters" and failed to present evidence of mutual contributions, profit sharing, common control, or an agreement to become joint venturers. No. 06-C-0628, 2008 U.S. Dist. LEXIS 11321, at *43–44 (E.D. Wis. Feb. 14, 2008). This record bears no resemblance to *Studio*. Here, the record contains years of coordinated engineering, software development, testing, commercialization efforts, shared intellectual-property planning, revenue sharing, and contemporaneous descriptions of the relationship as a partnership and integrated enterprise.

19

Paragon likewise characterizes Defendants' interrogatory responses as vague. (Dkt. 209/210 at 45, 48.) They are anything but. Across sixty-nine pages, Defendants identified the Enterprise's participants, their respective roles, confidentiality measures, and revenue-sharing structures. (Steelman Decl. Ex. 14.) In response to Interrogatory No. 10, Defendants incorporated Schedule A, identifying specific engineering contributions in seven categories. (*Id.*) Defendants' Amended and Supplemental Answer to Revised Interrogatory No. 5 likewise identifies sixty engineering contributions item by item. (K. Grundahl Decl. ¶¶ 94, 97.) Yet Paragon omitted both Schedule A and the supplemental interrogatory response from its filing. A movant cannot establish the absence of a genuine dispute by excluding the very materials that supply the factual detail.

Finally, Paragon argues that the 2017 organizational structure graphic was merely an unenforceable agreement to agree. But Defendants do not seek to enforce that document as a contract. The authorities Paragon cites—Metropolitan Ventures, Vohs, and Skyrise—address whether an indefinite writing is itself enforceable. Count III relies on the structure graphic for a different purpose: as objective evidence of the parties' shared understanding of how the Enterprise was organized. That evidence is especially probative because Daniel Holland requested the graphic, reviewed it, directed revisions, and the parties thereafter used the revised version in operating the Enterprise. (K. Grundahl Decl. ¶¶ 18–20.) Wisconsin law permits a joint venture to be established through conduct without any written agreement, to operate through entities created for that purpose, and to include both corporations and individuals. *Jolin v. Oster*, 44 Wis. 2d 623, 632–33, 172 N.W.2d 12 (1969); *Mortgage Assocs. v. Monona Shores, Inc.*, 47 Wis. 2d 171, 183, 177 N.W.2d 340 (1970). The parties therefore formed an implied joint venture regardless of whether the organizational chart itself constituted an enforceable contract.

20

**D.      None of Paragon's Remaining Arguments Eliminates the Genuine Issues of Material Fact.**

None of Paragon's remaining arguments eliminates the genuine disputes regarding the existence of the Enterprise. Instead, each depends on asking the Court to adopt Paragon's characterization of disputed evidence rather than drawing all reasonable inferences in Defendants' favor, something Rule 56 precludes.

Paragon first relies on an August 2023 confidentiality agreement—signed, according to Paragon, because its personnel were touring CBI's laboratory—as though it could erase a business relationship that began in 2009 and expanded into the Enterprise in 2016. (Dkt. 209/210 at 45; Holland Decl. ¶ 68.) But the agreement says the opposite of what Paragon suggests. It provides that Qualtim's confidential information remained Qualtim's "exclusive property"; that Paragon acquired no "intellectual property right or other right, license, title or interest" in that information; and that Paragon was required to "promptly return…or destroy" every medium "comprising, containing, derived from or based on" that information. (Steelman Decl. Ex. 18 §§ 1.4, 1.8.) The agreement expressly encompasses engineering methodologies, testing programs, software, and intellectual property—the very assets the Enterprise developed. (K. Grundahl Decl. ¶¶ 24, 64.) Nor has Paragon shown that it complied with those contractual obligations.

Paragon next asserts that Kirk Grundahl testified the relationship between Paragon, Qualtim, and Inspired Pursuits was ███████████████████████ (Dkt. 209/210 at 44.) The cited testimony contains no such statement, nor does any proposed finding of fact. Under this Court's procedures, "the Court will not consider facts contained only in a brief." (Procedure I.B.4.) The cited exhibit is instead an August 26, 2024 email to Mr. Grundahl's former counsel describing the respective roles of Clearspan, Qualtim Companies, and Paragon within the Enterprise.

21

Identifying each participant's role in the Enterprise is not a disclaimer that the Enterprise existed. (Steelman Ex. 7 at 41:23–42:15.)

Finally, Paragon points to invoices for Adam Heise's user-interface testing—performed by a truss-design technician rather than an engineer—and DrJ's per-drawing software payments as proof that the relationship was merely one of vendor and customer. (Dkt. 209/210 at 41.) But co-venturers routinely invoice one another, allocate expenses, and reimburse costs. These documents therefore require characterization. They may be read as evidence of an ordinary vendor relationship, or as sharing of costs to make the software better for a long-term commercial enterprise. That factual choice belongs to the jury, not the Court on summary judgment.

That same flaw permeates Paragon's entire argument. It repeatedly characterizes the Qualtim Companies as "at most" vendors or consultants (*id.* at 40), describes the relationship as "simply arm's length in nature" (*id.* at 44), dismisses the 2017 organizational structure as "merely anticipated" (*id.* at 47), and labels the parties' dealings "simply" a buyer-seller relationship. (*Id.* at 49.) Those are advocacy positions—not undisputed facts.

The Seventh Circuit has recognized that whether parties are joint venturers often turns on precisely this type of factual characterization. *Carle Foundation Hospital v. Shalala*, 57 F.3d 597, 599 (7th Cir. 1995). There is no single right answer; rather, the question depends on how the evidence is characterized. *Id.* Because reasonable jurors could characterize this record differently, summary judgment is inappropriate.

## III.  GENUINE DISPUTES OF MATERIAL FACT PRECLUDE SUMMARY JUDGMENT THAT PARAGON SOLELY OWNS THE COPYRIGHT.

### A.  Paragon Has Not Met Its Initial Burden on Two of Count I's Three Theories.

Paragon seeks summary judgment declaring that it is the sole owner of the copyright. It cannot obtain that relief without demonstrating the absence of a genuine dispute under every theory of ownership pleaded in Count I. It has not done so.

Count I alleges three independent bases for Defendants' ownership interests. *First,* Defendants allege that they jointly authored the software with Paragon and therefore own the work as joint authors under 17 U.S.C. §§ 101 and 201(a). *Second,* Defendants allege that the engineering incorporated into the software constitutes independently copyrightable works. *Third,* Defendants allege that the selection, coordination, and arrangement of those engineering materials constitute original copyrightable compilations. (Dkt. 178 ¶¶ 68–92.) Section II.1 of Paragon's brief addresses only the first theory. Although it discusses the software code and the engineering drawings the software generates, it says nothing about the independently authored engineering materials or the compilation claim.

That omission is dispositive of Paragon's motion. A party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine dispute as to the claim on which it seeks judgment. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Sole ownership necessarily fails if Defendants prevail under any one of the three theories alleged in Count I. Because Paragon never addresses two of those theories, it has failed to carry its initial Rule 56 burden.

The independently copyrightable works part of Count I include, among other things,

████████████████████████████████████████████

████████████████████████████████████████████

records. (Dkt. 178 ¶¶ 76–81.) The testing records matter commercially as well as legally: Paragon

23

markets the resulting capability as its defining feature, telling customers its software will "DESIGN AND ANALYZE ANY TRUSS USING ANY PLATE FOR ANY SHOP" and that "Paragon Design is the first cloud-based truss software that gives you the freedom to use any plate for any design for any shop." (Salemi Decl. Ex. 5 at 1, 3 (paragontruss.com, captured July 15, 2026); *see also* K. Grundahl Decl. ¶ 114 & Exs. 50–51.) The plate-substitution engineering behind that claim ███████████████████████████████████ d the Qualtim Companies paid for. (K. Grundahl Decl. ¶¶ 17, 106, 108, 113.) Paragon's motion does not analyze whether those works satisfy the Copyright Act, whether Defendants authored them, or whether they remain independently protectable apart from the software.

Nor does Paragon address Defendants' compilation claim. The Qualtim Companies selected what engineering data ████████████████████████████████ ██████████████████████████████ Those original selection and organizational decisions were embodied in written testing reports, design-value summaries, ██████ ████████████████████████████████████ Developed beginning about 2012 by Joe Michels, P.E.—four years before Paragon existed—it ████████████████████████████████████ ████████████████████████████████████ manufacturers—MiTek,

ITW/Alpine, Simpson, Eagle, Cherokee, Morton, and CH Machine—with directional resistance values for tension and shear at six angles across 23 named plate types, some derived from the Qualtim Companies' own testing. (Vogt Decl. ¶¶ 39–40.) Copyright protects precisely that type of original selection, coordination, and arrangement. *Feist Publications, Inc. v. Rural Telephone Service Co.*, 499 U.S. 340, 348 (1991).

Grundahl's expert report identifies the same type of original compilation in the lumber design-value database. Although the National Design Specification supplies engineering tables, it does not prescribe the species-combination selection rules, effective specific-gravity methodology, or length-factor application rules embodied in the Enterprise's work. Instead, the Qualtim

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████ (K. Grundahl

Expert Decl. Ex. 1, Item 16.) Whether those compilations are copyrightable is therefore an independent question that Paragon's motion never addresses.

Paragon may ultimately dispute those theories at trial. But because it elected not to challenge them on summary judgment, it has failed to establish that it is entitled to judgment declaring itself the sole copyright owner.

## B. The Contributions Are Copyrightable.

### 1. The Engineering Contributions.

A joint work requires both a copyrightable contribution and the intent to create a joint work. *Erickson v. Trinity Theatre, Inc.*, 13 F.3d 1061, 1068–72 (7th Cir. 1994); *Janky v. Lake County Convention &* Visitors *Bureau*, 576 F.3d 356, 361 (7th Cir. 2009). Paragon argues that the Qualtim Companies supplied only ideas, refinements, and suggestions and that any expression merged with published engineering standards. Neither contention survives this record.

25

Paragon first misreads *Janky*. That decision did not reject joint authorship; it found it. Reversing judgment for the sole-authorship claimant, the Seventh Circuit held that a contributor who authored approximately ten percent of a song's lyrics was a joint author because his work "went beyond general '[i]deas, refinements, and suggestions'" and instead consisted of "concrete expressions." The court further explained that crediting another person as a co-author is "strong evidence of intent to create a joint work" and that a later attempt to deny authorship is merely a "post hoc rationalization." *Janky*, 576 F.3d at 362–63. Equally important, Paragon quotes only part of the passage on which it relies. The full discussion recognizes that copyright law must distinguish routine editorial assistance from genuine creative contribution because denying protection to substantial contributions would defeat copyright's central purpose. *Id.* at 363. The court ultimately concluded that the disputed song was "a joint work." *Id.*

This case falls squarely on the authorship side of that line. The excluded category consists of nonexpressive elements, such as ideas, suggestions and editorial changes. *Gaiman v. McFarlane*, 360 F.3d 644, 658 (7th Cir. 2004); *Seshadri v. Kasraian*, 130 F.3d 798, 803 (7th Cir. 1997). The Qualtim Companies were not editors or commenting colleagues. They were the licensed professional engineers whose seals every truss design legally required and who could not seal designs unless the engineering embodied in the software satisfied their professional standards. Before Paragon implemented corresponding functionality, those engineering materials already

████████████████████████████████████████████████████████████████

written specifications, and the communications transmitting them to Paragon's developers. (K. Grundahl Decl. ¶¶ 3, 35; Vogt Decl. ¶¶ 36, 39–45.)

Nor must each contribution stand independently. *Gaiman* rejected precisely that approach, explaining that requiring each collaborator's contribution to stand alone would amount to "peeling

26

the onion until it disappeared." 360 F.3d at 658–59. The Seventh Circuit illustrated the point with two collaborators, one supplying the creative ideas and the other the "prose envelope." When the parties intended joint ownership, "that should be enough to constitute them joint authors." *Id.* at 659. The same principle applies here. The Qualtim Companies authored the engineering materials and communications that the published standards leave to licensed engineers, and Paragon coded from them.

Nor does § 102(b) eliminate copyright simply because an engineering work relates to standards or methodologies. As the Seventh Circuit explained in *American Dental Association v. Delta Dental Plans Ass'n*, a taxonomy may be used within a system without itself becoming an uncopyrightable "system." 126 F.3d 977, 979–81 (7th Cir. 1997). Facts do not organize themselves. The creative choices in selecting, arranging, and expressing technical information remain copyrightable because there are many ways to express the same underlying concepts.

The record demonstrates exactly those creative choices. Industry practice confirms that published standards do not dictate the engineering embodied in truss-design software. ▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Those differing outputs demonstrate alternative expression—

the evidence missing in *Seng-Tiong Ho v. Taflove*, 648 F.3d 489, 497–99 (7th Cir. 2011), where

the plaintiffs offered no evidence that the model could be expressed differently. Published standards establish general requirements, but they do not resolve the engineering questions presented by real-world truss design. (Vogt Decl. ¶¶ 24, 53; K. Grundahl Decl. ¶¶ 34, 95, 96.) Dr. John Gruber reaches the same conclusion, explaining that ANSI/TPI-1 repeatedly leaves discretionary engineering choices regarding force analysis, joint stiffness, fixity, effective lengths, and wood-to-wood transfer. Those decisions require professional engineering judgment. (Gruber Decl. Ex. 1 at 23, 28–29, 31.)

Dr. Ryan Sheatsley's source-code analysis independently verifies that those materials and communications ███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████ (Sheatsley Decl. Ex. 1 ¶¶ 65–95; K. Grundahl Decl. ¶¶ 71–73, 143.) Those engineering choices are precisely the categories Dr. Gruber identifies as left to the engineer rather than dictated by published standards.

Paragon's response is directed not at the engineering contributions themselves but at the labels used to describe them. It argues that words such as "system," "framework," "methodology," "protocol," "specifications," and "rules" fall within § 102(b). (Dkt. 209/210 at 23.) But copyrightability depends on the substance of the contribution, not the terminology used to describe it. As *Delta Dental* explained, the question is not what a work is called but what it actually is. 126

28

F.3d at 981. Paragon never addresses the sixty engineering contributions identified in Defendants' Amended and Supplemental Answer to Revised Interrogatory No. 5 or the source-code analysis identifying where those contributions appear in the software.

Finally, Paragon's remaining authorities do not alter the analysis. *Gates Rubber Co. v. Bando Chemical Industries*, 9 F.3d 823, 833–34 (10th Cir. 1993), merely recognizes that effort alone is not authorship. Defendants do not claim copyright in 8,000 hours of labor; they claim copyright in the engineering materials and compilations that labor produced. Nor does the abstraction-filtration-comparison methodology apply. That framework governs software infringement, not authorship or ownership. *Woods v. Resnick*, 725 F. Supp. 2d 809, 818 (W.D. Wis. 2010).

2.    **The Truss Design Drawing Notes, Output Format, and Data Fields.**



(*Id.* ¶ 15.)

Those contributions are copyrightable. Reversing a contrary district court decision, the Fifth Circuit held that the printed reports generated by structural-analysis software do not consist merely of uncopyrightable facts because they are "organized, descriptive tables," and competing

29

structural-analysis programs generated materially different reports. *Eng'g Dynamics, Inc. v. Structural Software, Inc.*, 26 F.3d 1335, 1345 (5th Cir. 1994). A truss-design drawing is precisely that type of report. The software generates it, a licensed professional engineer reviews and seals it, and it is transmitted to fabricators and building officials. (K. Grundahl Decl. ¶¶ 15, 27.) Defendants claim authorship only of the expressive portions they created—the notes, layout, wording, sequence, organization, and data presentation—not Paragon's software interface. Nor does the drawings' practical purpose defeat copyright protection. As the Seventh Circuit has explained, "original is not an antonym for utilitarian." *American Dental Ass'n v. Delta Dental Plans Ass'n*, 126 F.3d 977, 980 (7th Cir. 1997).

The record also contains direct evidence that Paragon copied those authored materials into its software. A drafting mistake in the Qualtim Companies' January 2016 cover sheet—misspelling "TDDs" as "TTDs"—appears verbatim in Paragon's software output on Job No. 32683 above a "Copyright © 2017...DrJ Engineering, LLC" notice. (K. Grundahl Decl. ¶ 119.) When the software malfunctioned in June 2016, it displayed the Qualtim Companies' internal field names, including "$PERENEWAL," in place of project information. (*Id.* ¶ 118.) And when Paragon sought guidance on treated lumber, Kirk Grundahl provided the paragraph to include on the drawing, which Paragon then incorporated into the software output. (*Id.* ¶ 69.) ANSI/TPI 1 does not require misspelling "TDDs," and no published standard supplied that language.

Those facts also expose the flaw in Paragon's Microsoft Word analogy. Paragon argues that recognizing Defendants' authorship would be like making an author who writes a novel in Microsoft Word a co-owner of Word, or an architect using AutoCAD a co-owner of AutoCAD. (Dkt. 209/210 at 24.) But the analogy reverses the facts. Novelists do not author Microsoft's templates. Architects do not write AutoCAD's output reports. Here, the Qualtim Companies

30

authored the notes, cover sheet, footer, back-page notes, output format, and data fields, and Paragon programmed those authored materials into its software.

████████████████████████████████████████████████████████

████████████████████████████████████████ (Dkt. 209/210 at 25.) That agreement allocates rights between DrJ and a single customer. Parties remain free to allocate intellectual-

████████████████████████████████████████████████████████

says nothing about its relationship with Paragon, which John Holland acknowledges ████████

████████████████████████████ (Holland Decl. ¶ 56.)

## C.   Intent Is a Question of Fact, and the Indicia Are Paragon's Own.

The Seventh Circuit evaluates intent objectively, looking not to later litigation positions but to the parties' contemporaneous conduct, including their decisionmaking authority, attribution of credit, and dealings with third parties. *Erickson v. Trinity Theatre, Inc.*, 13 F.3d 1061, 1068–72 (7th Cir. 1994). The Enterprise described in Section II supplies that objective conduct. Nearly every remaining indicator comes from Paragon's own contemporaneous records. Those records consistently identify DrJ as originating engineering specifications, approve implementations only after DrJ review, credit DrJ externally, and describe the resulting innovations as jointly owned.

### 1.   Paragon expressly described the innovations as jointly owned.

Three weeks after the January 2017 meeting, Daniel Holland left Grundahl a voicemail proposing ████████████████████████████████████████████████████████

████████████████████████████████████████ adding that he did not know "if a copyright of the design is in order or even patent protection, but whatever the innovation is, needs to be somehow protected." (K. Grundahl Decl. ¶ 40.) Consistent with that, the drawings carried a DrJ Engineering, LLC copyright notice from 2016 through June 2024. (*Id.* ¶ 27.)

31

### 2.    Paragon credited DrJ to third parties.

Crediting another contributor is "strong evidence of intent to create a joint work." *Janky v. Lake County Convention & Visitors Bureau*, 576 F.3d 356, 362–63 (7th Cir. 2009). At a

in TPI or what's in the codes," and Daniel Holland opened by recounting that he had involved Grundahl in sealing Paragon's truss designs even before Paragon existed so that "we had their help in keeping this on the straight and narrow." (K. Grundahl Decl. ¶ 48; K. Grundahl Decl. Ex. 12,

sure we're doing it right." (*Id.*) Those statements were made jointly by both Holland principals during a confidential presentation to a prospective commercial partner, not during litigation. That is the conduct Erickson identifies.

### 3.    Paragon's own records attribute the engineering to DrJ.

Twenty-four internal engineering reports generated by the software list each check with a eld identifying its source. When the source is a published standard, the field shows a section number—"8.2, 7.3.4-5, or 8.7.1.2." For six check categories it show

Requirement. (K. Grundahl Decl. ¶¶ 79–80.)

Paragon's development workbooks bear DrJ's name in their titles—"DrJ's Paragon

—as does its Trello board,                                (*Id.* ¶¶ 76, 82.) Its

32

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

determination recorded as ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ (*Id.* ¶¶ 77, 88, 91, 139, 150.)

### 4. Paragon treated DrJ's approval as required before deployment.

Paragon submitted engineering implementations to DrJ for approval before releasing them. (K. Grundahl Decl. ¶¶ 137, 146, 151, 161, 176.) When Paragon's developer asked in September 2018 whether to ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ DrJ made that decision and Paragon implemented it. (Vogt Decl. ¶¶ 48–49 & Exs. 6–7.) Its developers

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ (K. Grundahl Decl. ¶ 101.) They sorted changes by whether DrJ had to sign off—"I don't think we actually need to report changes that only occur 'when optimized' to DrJ in this case"—and logged others as "Discussed in meeting and approved." (*Id.* ¶ 78.) And in 2017 the principals formed Inspired Pursuits, LLC to hol ▬ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ language repeated in documents circulated in 2019 and 2020. (*Id.* ¶¶ 16, 18–20.) Those records demonstrate that Paragon treated DrJ's approval as a prerequisite to implementing engineering functionality.

### 5. The source code says the same thing.

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

33



(Sheatsley Decl. Ex. 1 ¶¶ 66, 81, 88–96.)

These are not later recollections. They are contemporaneous engineering comments embedded in the source code by the programmers implementing the functionality.

### 6.    The removals confirm what was there.

Paragon alleges that in March 2024, Grundahl sent it a memorandum asserting joint ownership, and it attached that memorandum, dated March 22, 2024. (Dkt. 1 ¶ 44; Dkt. 1-8.) Fourteen days later, ███████████████████████████████████████████████ venty-one days later, ███████████████████████ And eight days after Paragon filed this action, ██████ Sheatsley Decl. Ex. 1 ¶ 96.)

███████████████████████████████████████████████████████████

Because Sheatsley examined only four snapshots of a codebase exceeding 500,000 lines and more than 12,000 commits, and because Paragon produced neither the pull requests nor complete release notes, the references represent only a floor—not the full extent—of DrJ's credited contributions ██████████████████████ and its production could not support a count. (K. Grundahl Decl. ¶ 86 (cataloging missing release notes.))

### D.    Paragon's Showing Does Not Establish the Absence of a Dispute.

Paragon's showing establishes only one proposition: Paragon's programmers wrote the source code. Defendants do not dispute that. Count I, however, does not turn on who wrote the

code. It turns on whether Paragon alone authored the engineering expression incorporated into that code. On that question, Holland's declaration is notably silent—and, in fact, concedes the opposite.

Holland states that all "software coding and software design decisions" were made by Paragon personnel. (Holland Decl. ¶¶ 33–35.) Defendants do not contend otherwise. But he does not say Paragon authored the engineering the software applies. Paragon's lead developer on this work, Jeffrey Cox, "had no background in metal-plate-connected truss joint design; he was a programmer with a physics background, and the engineering the program needed came from the Qualtim engineers." (Vogt Decl. ¶ 41.) The declaration acknowledges that "Paragon itself does not provide engineering services," and that Paragon retained engineers because it needed to ████

████████████████████████████████████████████████████████

████████████████████████████████████████ (Holland Decl. ¶ 55.)

As of September 28, 2016, Paragon's software "produced coordinate geometry and member layout but could not determine plate sizes, plate capacities, joint forces, or plate substitution," ████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████ (K. Grundahl Decl. ¶ 14.) Paragon's counsel described the same division of responsibility during the December 10, 2025 hearing before Magistrate Judge Boor: "Our client is a computer programmer, and his company are computer software developers." (Dkt. 139 at 21:3–4.) Computer programmers write software. Licensed engineers supply the engineering, testing protocols, calibration, boundary-condition analysis, and professional judgment that give that software its substantive engineering content.

Rather than confronting those contributions, Paragon omitted the interrogatory response identifying them—the answer described above, which supplies each contribution's contributor,

35

description, date, recipient, and purpose. (K. Grundahl Decl. ¶¶ 94, 97 & Exs. 33–35.) It omitted

Schedule A as well when it provided discovery from the related '75 Action. A movant cannot

establish the absence of identified contributions by omitting the very documents in which those

contributions are identified.

Paragon's remaining evidentiary support is the testimony of Keith Hershey, but it does not

say what Paragon represents. Paragon cites Hershey as supposedly admitting that ███████████

████████████████████████████████████████████████████████ (Dkt. 209/210 at 20.)

That is not what Hershey testified. Asked whether Paragon personnel decided how information

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

Hershey Dep., June 2, 2026, at 136:8–18.) He also testified, in the same pages Paragon filed, that

███████████████████████████████████████████████████████████████████████

█████████████████████████████████████████ (*Id.* at 135:8, 135:12–14.)

What Paragon left out explains why Hershey could not answer. He is not an engineer—

"As stated, I am not an engineer." (Salemi Decl. Ex. 3, Hershey Dep., June 2, 2026, at 99:5, 169:4,

███████████████████████████████████████████████████████████████████████

experience using multiple different softwares…not necessarily from an engineering standpoint but

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

spanning the principal development period. (*Id.* at 55:5, 60:8–10.) Paragon filed roughly a fifth of

the transcript and omitted every page establishing those points.

36

The testimony Paragon did file supports Defendants. Hershey testified that ▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮ (Steelman Decl. Ex. 5, Hershey Dep., June 2, 2026, at 137:14–17, 138:10–13.) That is

precisely the engineering Defendants authored and contend is copyrightable.

Paragon likewise argues that, "[a]fter extensive discovery," Defendants "cannot articulate

any independent copyrightable contributions." (Dkt. 209/210 at 24.) But Paragon controlled the

scope of that discovery. It produced only four point-in-time versions of the source code—dated

December 11, 2014, May 3, 2018, April 11, 2024, and January 3, 2025—from the main production

branch of a codebase exceeding 500,000 lines and more than 12,000 commits. It did not produce

the remaining development branches, where testing, calibration, and feature development

occurred, even though it acknowledges that references to Qualtim Companies ▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮ Nor did it produce the Pull Requests, which record what changed and

why, and which Paragon acknowledges ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Sheatsley Decl. Ex. 1 ¶¶ 52–60.)

A movant that restricts the available evidence cannot later rely on the limits of its own production

as proof that no additional evidence exists.

Finally, Paragon points to its logo and website terms of use as evidence of ownership. (Dkt.

209/210 at 21.) Those are unilateral assertions of ownership, not evidence of authorship. No one

37

at Paragon ever presented those terms to the Qualtim Companies, who neither saw nor accepted them. (K. Grundahl Decl. ¶ 67.) If copyright notices alone established ownership, then the DrJ Engineering copyright notice appearing on the software's truss design drawings for nearly eight years would establish DrJ's ownership instead.

Paragon has established only that its programmers authored the software code. Defendants have never disputed that proposition. But Paragon has not shown that it alone authored the engineering expression implemented in that code, negated the specific engineering contributions Defendants identified, reconciled the repeated attribution to DrJ throughout its own contemporaneous engineering records, or eliminated the genuine factual disputes surrounding joint authorship. At a minimum, those disputes preclude summary judgment.

## IV.    PARAGON IS NOT ENTITLED TO SUMMARY JUDGMENT THAT IT SOLELY OWNS A TRADE SECRET IT HAS NEVER IDENTIFIED.

Paragon seeks a declaration that it solely owns the trade secrets in the Paragon Truss Software. (Dkt. 209/210 at 27–31; Pl.'s PFOF ¶¶ 32–34.) But a declaration of trade-secret ownership presupposes a trade secret to own, and a trade secret exists only if specifically identified information satisfies the statutory definition—information that derives independent economic value from not being generally known and is the subject of reasonable secrecy measures. Wis. Stat. § 134.90(1)(c); *N. Highland Inc. v. Jefferson Mach. & Tool Inc.,* 2017 WI 75, ¶ 20, 898 N.W.2d 741, 749. Ownership is not conferred by assertion; a claimant cannot gesture at a body of software, declare it protected, and obtain a decree of sole ownership of "trade secrets" it never pinned down. Paragon identifies no trade secret with specificity, establishes no economic value, and—by its own concession—seeks protection for material that includes public-domain content. No trade secret has been shown to exist.

38

*First*, Paragon never identifies the trade secret it claims. Its proposed findings describe it only as "the source code" and "the specific compilation of the software." (Pl.'s PFOF ¶¶ 32–33.) But a claimant "must do more than just identify a kind of technology and then invite the court to hunt through the details," and must "separate the trade secrets from the other information that goes into any software package." *IDX Sys. Corp. v. Epic Sys. Corp.*, 285 F.3d 581, 583–84 (7th Cir. 2002); accord *Kuryakyn Holdings, LLC v. Ciro, LLC*, 242 F. Supp. 3d 789, 798–99 (W.D. Wis. 2017). Labels do not supply that identification. "The specific compilation of the software" names nothing in particular; Paragon never says which selection or arrangement it claims is secret or how it differs from the ordinary organization of such a program. Pointing to the source code and calling it a "compilation"—without describing what the code teaches or how it translates to a protectable secret—is precisely the invitation to "hunt through the details" that the governing cases forbid.

And while Paragon's brief expands the claim to its "software architecture design" (Br. 30), those words appear nowhere in its proposed findings; a bare label is not a trade secret without an explanation of what the information is and why it qualifies. Asked in discovery for documents "sufficient to identify each trade secret that Paragon contends is at issue," Paragon answered: "Paragon's software code for implementing the Paragon Truss Software is Paragon's trade secret." (Pl.'s Resps. to Defs.' Third Reqs. for Prod. No. 18, Feb. 11, 2026 (Salemi Decl. Ex. 4).)

The failure is best seen against what Paragon could have offered and did not. A party establishing a software trade secret can produce the source code; flow charts, block diagrams, or module specifications showing the arrangement it claims; identification of the specific algorithms, parameters, or design choices said to be secret, separated from the routines common to the field; and expert testimony that the identified information is not generally known and derives value from secrecy. Paragon offered none of this—no code, no diagrams, no specifications, no identified

39

algorithm or parameter, and no expert testimony that anything is secret or valuable. It withheld even the commit log said to show what its developers wrote, offering it only for in camera review. (J. Holland Decl. ¶ 36 n.1.) In place of a showing, Paragon offers a single declaration from its principal asserting the code is secret and valuable. That is argument, not identification.

*Second*, at most Paragon establishes that its code is confidential, not that it is a trade secret. Its evidence goes to secrecy measures—restricted access, multi-factor authentication, non-disclosure provisions, and SaaS delivery. (Pl.'s PFOF ¶¶ 23–32.) But confidentiality is not trade-secret status; the information must also derive independent economic value from not being generally known. Wis. Stat. § 134.90(1)(c). On that element Paragon offers no evidence—no sales, revenue, licensing, or market data—only the conclusory assertions that secrecy "provides value" and that the code is its "most valuable...asset." (Pl.'s PFOF ¶¶ 23, 34; J. Holland Decl. ¶¶ 37, 46.)

Paragon withheld the records that would substantiate value, objecting that its financial investment was "neither relevant...nor proportional." (Pl.'s Resps. to Defs.' Third Reqs. for Prod. Nos. 54–58, 64–67, Feb. 11, 2026 (Salemi Decl. Ex. 4) ("Paragon has withheld documents on the basis of its objections to this request.").) And its own submission refutes the assertion: the ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████ (J. Holland Decl. Ex. 6, PARAGON-005801.)

*Third*, Paragon concedes its software is a mix of protectable and unprotectable material, then declines to separate them. It admits the software "provides functions...that do not qualify for trade secret protection because they are disclosed in public standards and/or otherwise known in the truss industry," yet asserts "that issue need not be resolved." (Br. 30 n.10.) It must be

40

resolved—as Paragon's own authorities require. "Blanket allegations that all information in or about its product is a trade secret are not enough"; a claimant must identify the secret with "reasonable particularity" and separate it from general knowledge. *Options Unlimited Rsch. Corp. v. W. & S. Fin. Grp., Inc.*, 2025 U.S. Dist. LEXIS 37760, at \*29–30 (S.D. Ohio Mar. 3, 2025); accord *Computer Assocs. Int'l v. Quest Software, Inc.*, 333 F. Supp. 2d 688, 695–97 (N.D. Ill. 2004) (protection reaches the "specific…applications as they are used," not the "generic concepts" or "parts of the work…in the public domain"); *Unix Sys. Labs., Inc. v. Berkeley Software Design, Inc.*, 1993 U.S. Dist. LEXIS 19505, at \*50–53 (D.N.J. Mar. 3, 1993). Having admitted its code contains public material, Paragon was required to separate what it claims is secret; it refuses, and seeks a wholesale declaration of ownership over code it concedes is part public.

*Fourth,* to the extent any content rises above the public standards to qualify, the record shows it is Defendants' confidential engineering, not Paragon's. Paragon concedes that it "is not an engineering company," that it "does not provide engineering services," and that its outputs are "for conceptual use only" and not valid "unless reviewed, verified, and stamped by a competent professional engineer." (Holland Decl. ¶ 26.) ███████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

█████████████████████████ (*Id.* ¶ 55.) The engineering materials reflected in the software's analyses, test-derived design values, and calibration therefore could not have originated with Paragon's personnel; by its own admission, Paragon does no engineering and had no licensed engineer to perform it. That engineering came from the licensed engineers at DrJ, and Paragon's

███████████████████████████████████████████████████████████████

████████████ (Steelman Decl. Ex. 4, Bierema Dep., June 9, 2026, at 114:1–4, 114:22–25.)

41

Paragon's own documentation confirms it models on the Canadian TPIC standard because the U.S. standard "offers little...about Analog Modeling," and deviates even from TPIC. (K. Grundahl Decl. ¶ 71, Ex. 29.)

The types of engineering Defendants contributed are described in an exhibit Paragon itself filed. Each represents proprietary engineering that DrJ and the Qualtim Companies developed through testing and professional judgment and that ANSI/TPI 1, the NDS, ASCE 7, and the other industry standards do not supply. In their answer to Interrogatory No. 10—which Paragon attached as Steelman Declaration Exhibit 14—Defendants identify the trade secret categories, which include copyrighted and copyrightable materials: (a) engineering methodologies for structural-component design, including structural modeling and load-path analysis beyond the standards' baseline; (b) structural testing programs and empirical performance data not drawn from any published source; (c) calibration materials converting that test data into the design parameters applied in the software; (d) engineering decision and validation logic for evaluating design conditions, safety factors, and tolerances where the standards are silent or conservative; (e) engineering workflow systems integrating testing, analysis, and design; (f) professional engineering validation and sealing procedures for the drawings the software generates; and (g) the engineering materials and communications applied within the software itself. (Steelman Decl. Ex. 14, Answer to Interrog. No. 10, at 30–33; see also K. Grundahl Decl. ¶¶ 97, 100, 104.)

Paragon produced that answer but omitted its Schedule A, which details the specific contributions these categories summarize. Defendants need not prove these are trade secrets to defeat Paragon's motion; it is enough that the record raises a genuine dispute as to whether the protectable engineering the software applies is Defendants' rather than Paragon's—a dispute supplied by Paragon's own documentation and witnesses and by the answers Paragon filed.

*Fifth,* Paragon cannot own that engineering under either view of the parties' relationship. If the parties operated the joint venture Defendants describe, the engineering was contributed to the enterprise but never transferred to Paragon—no signed writing assigns it—so authorship and initial ownership remained with Defendants. 17 U.S.C. §§ 201(a), 204(a); (Holland Decl. ¶ 56). And if there was no joint venture, as Paragon contends, Paragon had no authorization to use Defendants' confidential engineering outside a venture at all—the premise of Defendants' misappropriation claim in the related action. Either way, the protectable engineering embedded in the software is not Paragon's to own. Information developed and disclosed within a confidential relationship does not pass to the recipient by virtue of that disclosure. *See Learning Curve Toys, Inc. v. PlayWood Toys, Inc.,* 342 F.3d 714, 722–29 (7th Cir. 2003).

At a minimum, these matters are genuinely disputed. Paragon contends, through its expert, that the code reflects only the general skill of a competent truss designer applying published standards. Defendants' experts opine to the contrary—that the code embodies engineering methodologies and analog-modeling judgment the published standards do not supply and that Defendants developed and provided. (Gruber Decl. Ex. 1 at 30–31; K. Grundahl Expert Decl. Ex. 1, Items 10, 11, 15, 16, 24, 35, 39, 46–47.) That is a genuine dispute of material fact the Court cannot resolve on summary judgment. Having identified no trade secret, established no economic value, separated nothing from the public material it concedes is intermixed, and failed to show the engineering is its own, Paragon is not entitled to summary judgment of sole ownership.

## V.    PARAGON IS NOT ENTITLED TO SUMMARY JUDGMENT THAT IT SOLELY OWNS THE TRADEMARKS.

Paragon seeks a declaration that it is the "sole and exclusive owner" of four marks— PARAGON, TRUSS PAL, TRUSSLINK, and ANYPLATE (the "Paragon Marks"). (Dkt. 209/210 at 33–36; Pl.'s PFOF ¶¶ 35–43.) Defendants do not dispute that Paragon uses these names or that

43

it holds federal registrations for PARAGON and TRUSS PAL. Those facts, however, do not resolve the question presented by Count III. The issue is whether the Paragon Marks and the goodwill they represent belong exclusively to Paragon or instead were developed as assets of the Joint Venture Enterprise. Because ownership depends upon the parties' disputed relationship and the goodwill they jointly created, Paragon is not entitled to summary judgment.

When parties develop and use a mark as part of a joint venture, and those assets were not transferred to a separate legal entity, the mark belongs to the venture rather than any individual participant. *LunaTrex, LLC v. Cafasso*, 674 F. Supp. 2d 1060, 1062–63 (S.D. Ind. 2009); *Durango Herald, Inc. v. Riddle*, 719 F. Supp. 941, 948–49 (D. Colo. 1988). Trademark ownership follows the associated goodwill. So if the goodwill underlying the Paragon Marks was jointly created by the parties' Enterprise, Paragon cannot establish as a matter of law that it alone owns those marks.

The record presents precisely that dispute. Defendants' Answer alleges that "Truss Pal" was developed as part of the Joint Venture Enterprise and "is not solely owned by Paragon." (Dkt. 178 ¶¶ 80–81.) Defendants' verified supplemental interrogatory answer likewise explains that Defendants do not concede ██████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████████████████████ (Defs.' Supp. Answer to Interrog. No. 9, at 7.) As discussed in Argument II, the parties jointly developed, engineered, tested, validated, and marketed an integrated offering that combined Defendants' engineering with Paragon's software. During that relationship, Daniel Holland repeatedly described the enterprise as a ████████████ and John Holland stressed ██████████████████████ (K. Grundahl Decl. ¶¶ 47, 51, 63.) The goodwill associated with the Paragon Marks arose from that joint enterprise, not from Paragon acting alone.

44

The parties' creation of Inspired Pursuits confirms the same understanding. They formed Inspired Pursuits to hold the enterprise's intellectual property, including software and related intellectual property, but the contemplated transfer was never completed before Daniel Holland's death. The failure to complete that transfer does not establish that the Paragon Marks always belonged exclusively to Paragon. Rather, it is consistent with Defendants' position that the marks were developed as assets of the Joint Venture Enterprise and were intended to be transferred into the jointly owned holding company.

Paragon's reliance on the absence of a written assignment is therefore misplaced. The rule that an assignment of a trademark without its accompanying goodwill is invalid, *Money Store v. Harriscorp Finance, Inc.*, 689 F.2d 666, 676–78 (7th Cir. 1982), governs transfers between existing owners. It does not determine whether the marks were venture assets from the outset. Defendants do not claim ownership through assignment. They contend that the Paragon Marks and their associated goodwill were never Paragon's exclusive property to assign in the first place. (Dkt. 178 ¶ 84.) That dispute depends upon the existence and scope of the Joint Venture Enterprise established in Argument II and therefore cannot be resolved on summary judgment.

Nor does Paragon's own evidence eliminate that factual dispute. Its "disclaimer" argument rests on testimony that ███████████████████████████████████████████████████ ██████████████ (Pl.'s PFOF ¶ 43; IP-LLC Dep. 208–209.) That testimony establishes only that the contemplated transfer into the holding company was never completed. It is not a disclaimer by the Qualtim Companies or the Grundahls that Paragon exclusively owned the marks before the attempted transfer. Likewise, Paragon's evidence that Defendants do not presently use the Paragon Marks (Pl.'s PFOF ¶¶ 41–42) says nothing about who developed the goodwill associated with those marks during the parties' joint enterprise.

Paragon's claims regarding TRUSSLINK and ANYPLATE fail for the independent reason that they fall outside the pleadings. The Complaint seeks ownership of the marks associated with the "Paragon Truss Software" and identifies only "Truss Pal" by name. (Dkt. 1 ¶¶ 79–81.) A plaintiff may not amend its complaint through summary judgment briefing. *Anderson v. Donahoe*, 699 F.3d 989, 997 (7th Cir. 2012); *Danaher Corp. v. Lean Focus, LLC*, 2021 U.S. Dist. LEXIS 141800, at *55–56 (W.D. Wis. July 28, 2021). In any event, Paragon applied to register TRUSSLINK and ANYPLATE only during this litigation, alleged first use at or after the commencement of suit, and those applications remain pending. (Pl.'s PFOF ¶ 38.) Summary judgment declaring present, exclusive ownership of unpleaded marks that have not yet matured into registrations is unwarranted.

Finally, even a declaration regarding the Paragon Marks would resolve only trademark ownership. It would not establish ownership of the copyrights, trade secrets, engineering methodologies, or other intellectual property embodied in the Paragon Truss Software, all of which remain genuinely disputed for the reasons set forth in Arguments III and IV.

Because ownership of the Paragon Marks depends upon disputed facts concerning the Joint Venture Enterprise and the goodwill the parties jointly developed, and because TRUSSLINK and ANYPLATE are not properly before the Court in any event, Paragon is not entitled to summary judgment declaring itself the sole and exclusive owner of the Paragon Marks.

## VI.    PARAGON IS NOT ENTITLED TO A DECLARATION OF PATENT OWNERSHIP.

Paragon seeks a declaration that it owns "all patent rights and patentable inventions" embodied in the Paragon Truss Software, including "any patents that may issue." (Dkt. 209/210 at 36–37.) Its argument spans only three sentences, cites no authority, identifies no invention, inventor, or patentable subject matter, and relies entirely on the assertion that Defendants do not

46

claim patent rights. That showing does not entitle Paragon to judgment as a matter of law. An undeveloped argument does not satisfy Paragon's burden under Rule 56. *M.G. Skinner & Associates Insurance Agency v. Norman-Spencer Agency, Inc.*, 845 F.3d 313, 321 (7th Cir. 2017).

Defendants' decision not to assert ownership of patent rights is irrelevant. Patent ownership is determined by federal patent law, not by a party's silence. Paragon identifies no invention, no inventor, and no written assignment establishing ownership of any patent rights. *See* 35 U.S.C. § 261; *Board of Trustees of the Leland Stanford Junior Univ. v. Roche Molecular Systems, Inc.*, 563 U.S. 776, 785–86 (2011).

Paragon has admitted that no patent has issued and that no patent application is pending, there is no patent right for the Court to adjudicate. (Pl.'s PFOF ¶¶ 47–48 (Dkt. 212); J. Holland Decl. ¶¶ 47–48.), there is no existing patent right for the Court to adjudicate. Asking the Court to declare ownership of "patents that may issue" is the type of advisory opinion that the Declaratory Judgment Act rejects. 28 U.S.C. § 2201(a); *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007). Courts therefore cannot adjudicate inventorship of hypothetical future patents. *E.I. du Pont de Nemours & Co. v. Okuley*, 344 F.3d 578, 584 (6th Cir. 2003); *HIF Bio, Inc. v. Yung Shin Pharmaceuticals Industrial Co.*, 600 F.3d 1347, 1353–54 (Fed. Cir. 2010). Simply put, federal courts lack jurisdiction to decide contingent disputes resting on future events that may never occur. *Texas v. United States*, 523 U.S. 296, 300 (1998).

## CONCLUSION

Paragon's motion asks the Court to resolve on paper what the record leaves in dispute— who authored the engineering the software applies, what relationship the parties had while it was being built, and what that relationship means for ownership. Paragon's own filings, records, source code, and witnesses supply the conflicting evidence. Its trade secret claim fails at the threshold

47

because Paragon has never identified the secret it says it owns, and its patent claim fails because no patent or patent application exists.

Defendants respectfully request that the Court deny Plaintiff's motion for summary judgment in its entirety.

Dated this 28th day of July, 2026.

**MURPHY DESMOND S.C.**
Attorneys for Qualtim, Inc., Center for Building Innovation, LLC, DrJ Engineering, LLC, Inspired Pursuits, LLC, and Suzanne Grundahl.

Electronically Signed By: */s/ Scott G. Salemi*
    Scott G. Salemi
    State Bar Number: 1118960
    33 East Main Street, Suite 500
    Madison, WI 53701-2038
    Phone: (608) 257-7181
    Fax: (608) 257-2508
    ssalemi@murphydesmond.com

**KIRK GRUNDAHL**
Pro Se Defendant-Counterplaintiff

Electronically Signed By: */s/ Kirk Grundahl*
    Kirk Grundahl
    1130 Fairway Court
    Lake Mills, WI 53551
    Phone: 608-217-3713
    kgrundahl@qualtim.com