UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WISCONSIN

PARAGON COMPONENT SYSTEMS, LLC,

Plaintiff,

v.

Case No. 3:25-cv-00170-wmc

QUALTIM INC., CENTER FOR BUILDING
INNOVATION LLC, DRJ ENGINEERING LLC,
INSPIRED PURSUITS LLC, KIRK GRUNDAHL,
and SUZANNE GRUNDAHL,

Defendants.

## DECLARATION OF JAMES VOGT

I, James Vogt, declare as follows pursuant to 28 U.S.C. § 1746:

## INTRODUCTION

1.    I am over the age of eighteen, am competent to testify, and make this declaration based on my personal knowledge and my review of the documents identified herein. If called as a witness, I could and would testify competently to the facts stated here.

2.    I am a retired professional engineer. I worked with Kirk Grundahl and the companies he owns and operates, which I will refer to collectively as the Qualtim companies, from March 1996 to August 1999, and again from the spring of 2006 until my retirement in 2025. When I first joined in 1996, the operating entity was Qualtim, Inc. DrJ Engineering, LLC and the Center for Building Innovation, LLC were formed later, during my second tenure. Throughout both periods I reported to Kirk Grundahl and my work was performed on behalf of whichever of his companies was then in operation. I make this declaration to describe the engineering work I

personally performed and observed in connection with the development of the Paragon truss design software, and to describe the engineering work the Qualtim companies performed on that software.

**EDUCATION AND PROFESSIONAL BACKGROUND**

3.    **Degrees.** I have three degrees. My Bachelor of Science in Forestry is from the University of Wisconsin–Stevens Point in 1981. That gave me a background in wood as a material: how species, moisture content, and grade affect strength and how wood actually fails. My first Master of Science is in Material Science and Engineering from Washington State University in 1985. That covered how materials behave under load, including composite and engineered materials. My second Master of Science is in Civil Engineering with a structures emphasis, also from Washington State in 1988. That is where I learned structural analysis, member design, and connection design, which is what you need to design a metal-plate-connected wood truss. The combination of wood science and structural engineering is what I brought to this work.

4.    **Professional licensure.** I was first licensed as a professional engineer in 1992 in Idaho. At one point, I held active licenses in forty states. I retired from active engineering practice in 2025.

5.    **The International Building Code and the engineer seal requirement.** I testified at hearings to establish the International Building Code, which is what we call the IBC. Before the IBC, the United States had three separate regional model building codes depending on where you were in the country, and states like Wisconsin had their own codes on top of that. The IBC was developed in the late 1990s to replace the three regional model building codes. During those hearings, when it came to metal-plate-connected wood trusses specifically, the code officials who were developing the code, along with engineers outside the truss industry, wanted a provision requiring that truss designs be sealed by a licensed engineer. A truss is a structural component

primarily used in roofs and floors to support environmental and occupancy loads. If a truss is not designed and manufactured correctly, the truss and structure can fail. A failed truss is a public safety issue, which is why a licensed engineer's seal is required, and consistent with a professional engineer's ethical obligations to protect public safety. The specific problem with trusses is that the design is not straightforward to verify. Because of that, the code officials wanted a licensed engineer to review and seal every truss design before it went into construction. The requirement was ultimately adopted.

6.    **Fixed-property versus variable-property products.** The reason the code officials wanted verification is that a metal-plate-connected wood truss is what I call a variable-property product, which is different from most other engineered wood products. Take an I-joist or an LVL beam. Those are fixed-property products. For a given span and load, an I-joist has a defined maximum bending strength and shear strength that a technician can look up in a table. If the loads are within those limits, the product works. That type of product was not required to be sealed. A truss is different. You can have the same truss profile, same span, same height, same pitch on the top chord, and get a myriad of different designs because you can use different lumber species, different lumber sizes, different plates, and different plate sizes. A contractor looking at two competing bids for the same truss from two different manufacturers could be looking at completely different lumber sizes and plate configurations.

7.    **The plate manufacturers and their software.** The major plate manufacturers, MiTek, Alpine (now part of ITW), Simpson Strong-Tie, Eagle Metal Products, and Cherokee Metal Products, do not just make the metal connector plates used to join truss members. They also provide the truss design software that structural building component manufacturers use. A structural building component manufacturer typically produces roof and floor trusses and may also

produce wall panels and floor panels, and sell other types of wood structural components. For ease of reference I will use the term "truss manufacturer" throughout this declaration, but I mean it to include the full range of structural building component manufacturers. The plate manufacturers employ professional engineers on staff who develop the proprietary engineering built into their software. The programmers who write the software do so based on what those engineers specify. Because the software specifies which plates to use, a truss manufacturer tied to MiTek software is also tied to MiTek plates, and MiTek controls what those plates cost.

8.      **The analog standardization debate.** In the 1990s the Engineering Review Committee for the Wood Truss Council of America (WTCA) discussed with the engineers for the plate manufacturers, the possibility of standardizing the analogs across all the plate manufacturers' software. The push came from truss manufacturers. A manufacturer using Alpine software might design a truss for a given span and loading application requiring 2x6 chords of a given species and grade. A competing truss manufacturer using MiTek software may be able to design a truss for the same span and loading conditions that only requires 2x4 lumber of the same species and grade specified in the Alpine truss design. The reasons for the difference were due to differences between the analogs used to analyze the trusses, as well as engineering judgments and assumptions used in developing the software. The truss manufacturers wanted the analogs standardized so the competition was on price, not on whose engineers had developed a better analog. The plate manufacturers pushed back hard. Their position was that their proprietary engineering analogs were their competitive advantage. If their engineers had come up with a better way to analyze a joint, they did not want to give that up. The standardization effort failed. Each company kept its own proprietary analogs.

4

9. **The truss design technician.** The truss design technicians at manufacturing facilities who use the design software are not typically engineers. They may have a drafting background, or sometimes just a general aptitude for computers. The technician running the software cannot evaluate whether the output makes engineering sense.

10. **Specialty in engineered wood products.** My entire career has been in structural wood products. That includes I-joists, laminated veneer lumber (LVL), structural composite lumber (SCL), parallel strand lumber (PSL), metal-plate-connected wood trusses, pin-connected tubular steel trusses, panelized wall and floor systems, oriented strand board, and plywood. It is a specialty field.

11. **Trus Joist competitive product testing (c. 1988–1990).** My first job after finishing my second master's degree was at Trus Joist Corporation in Boise, Idaho, as an engineer-in-training (EIT). I did competitive product testing of engineered wood products, including I-joists and parallel chord trusses. One product I tested was the parallel chord truss from Imperial Components of Illinois.

12. **Trus Joist regional engineering work (c. 1990–1996).** I also worked as a regional engineer at Trus Joist, providing engineering support for Trus Joist products sold and used in Iowa, Minnesota, Nebraska, North Dakota, South Dakota and Wisconsin. That is where I got to know Kirk Grundahl, who was at Trus Joist for a portion of that time.

13. **First tenure at the Qualtim companies (March 1996–August 1999).** I joined the Qualtim companies in March 1996, working initially at Kirk Grundahl's home and later at the Normandy Lane office in Madison. My work during this period centered on the Wood Truss Council of America (WTCA), the predecessor to the Structural Building Components Association (SBCA). Specifically:

(a)    I helped develop the Truss Technician Training (TTT) program through WTCA. SBCA still administers the program today. TTT is a three-level certification curriculum, Levels I, II, and III, for truss design technicians and other manufacturing facility personnel. The curriculum covers basic design and engineering fundamentals of metal-plate-connected wood trusses: industry design standards, truss fabrication from design through installation, load development, and structural analysis as it applies to truss design. It does not train technicians on any specific software package. The TTT courses were initially delivered in person. I would fly to a location and run a four-day course. I taught the program for years. Later, the program transitioned to an online format. I know from having trained these technicians exactly what a truss design technician learns and does not learn. A technician who completes all three levels of TTT understands truss geometry, loading, and general engineering principles. A technician does not learn, and TTT does not teach, the specific engineering that goes into truss design software. That engineering is not in TPI 1 and it is not in TTT. It is the proprietary work of the engineers who develop, document, and validate the software.

(b)    I also contributed to the early content that eventually became the Building Component Safety Information (BCSI) guide, which covers bracing and handling of trusses during installation.

14.    **Brunsell Lumber and Millwork, working for a component manufacturer (1999–2001).** After leaving the Qualtim companies in August 1999, I went to work for Brunsell Lumber and Millwork, which had a truss plant in Verona, Wisconsin, that later moved to Mount Horeb. Brunsell wanted to produce panelized walls and floors, and I helped with the design of these products. I also worked on truss designs using Alpine software, which was itself getting into

wall-panelizing software at that time. I was there about a year and a half. I was not an outside consultant advising a manufacturer. I worked there. I was on the manufacturing floor and in the design office. I saw from the inside how a truss plant operates: how a design moves from software output to saw to press table to the field. I understood the pressures on design technicians, the kinds of problems that come up, and what a program actually needs to do to be usable in production.

15.    **Return to the Qualtim companies (spring 2006–2025).** I came back to the Qualtim companies in the spring of 2006. My first project was updating- BCSI from the 2003 to the 2006 edition. I also worked on span tables for lumber, failure investigation consulting including truss collapses during construction, and non-destructive evaluation of lumber properties using dynamic vibration techniques, which is a way of measuring lumber stiffness and strength rather than relying on published averages.

16.    **Sealing truss designs for Clearspan and** ▆▆▆▆▆ Around 2009 the Qualtim companies started sealing truss designs for Clearspan Components, which at that time used CompuTrus software. MiTek subsequently acquired CompuTrus, and after that acquisition Clearspan switched to MiTek software. We also sealed designs for ▆▆▆▆, which used ▆▆▆ software. ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆

17.    **How I came to work on the Paragon software.** My involvement with the Paragon software grew out of the work the Qualtim companies were already doing with Clearspan Components. We were sealing truss designs for Clearspan, which was Dan Holland's company.

That relationship between Dan Holland and Kirk Grundahl and the Qualtim companies was already in place. When Dan Holland formed Paragon to develop independent truss design software that work came out of the same relationship. I began working on the engineering for the Paragon software in late 2015 and early 2016, as part of that ongoing partnership between Dan Holland and the Qualtim companies.

## THE DIFFERENCE BETWEEN A TRUSS DESIGN TECHNICIAN AND A LICENSED PROFESSIONAL ENGINEER

18.    I spent years developing the engineering that goes into truss design software, and I also helped write the curriculum that defines what a truss design technician learns.

19.    A TTT-certified technician understands truss geometry and loading, how to read a design drawing, how to enter inputs into design software, how to interpret the pass/fail outputs the software produces, and how to apply the quality control provisions of ANSI/TPI 1 Chapter 3 to the physical truss being manufactured.

20.    A truss design technician does not know, and TTT does not teach, any of the following: how the software determines joint fixity; how the analog is constructed for a complex multi-member joint; how the heel plate area is divided between the top chord and bottom chord; what compression reduction factor to apply at a wood-to-wood bearing joint; how to check moment resistance at a splice plate; what plate performance values to use for a given manufacturer's plate in a given orientation; how to analyze a stacked chord configuration; or how to evaluate whether the program's output for any of these conditions is correct. TTT does not cover these things because they require professional engineering judgment that comes from years of education, testing experience, and engineering practice, and they are not found in, and cannot be learned from, TPI 1. ANSI/TPI 1 itself states in its Target Audience section that the standard "has

8

been developed primarily for use by professional engineers and architects involved in the design of metal-plate-connected wood trusses."

21.     During our meetings with the Paragon team, we sometimes used screen sharing. I recall seeing the Paragon program displayed, ███████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████, just the section reference and the result. An inexperienced person reviewing that information might think the program is just following what TPI says. But referencing the section number is not the same as the engineering that produces the result. Behind that section reference is a specific way of handling forces at that joint, assigning plate values, treating moment resistance, applying the compression reduction factor. None are specified by TPI 1. That engineering came from our work, and we set it down in our own documents. A truss design technician can read that output and know the joint passed, but cannot evaluate whether the engineering behind that result is correct. That is an engineering question.

22.     Because a technician cannot make these engineering determinations, every truss design the software produces must be reviewed and sealed by a licensed professional engineer before it is used, as described below.

**WHY TRUSS DESIGN SOFTWARE REQUIRES
<u>ENGINEERING JUDGMENT BEYOND TPI 1</u>**

23.     **TPI 1 is written at a level of generality that requires engineering judgment to apply.** The ANSI/TPI 1 standard, the principal industry standard for metal-plate-connected wood truss design, is written in general terms. In Section 1.3.1, Scope, it states that it "establishes minimum requirements for the design and construction of metal-plate-connected wood trusses."

9

In Section 1.3.2.1 it provides that the Standard "does not intend to preclude the use of materials, assemblies, structures, or designs not meeting the criteria herein, when they demonstrate equivalent performance for the intended use to those specified in this Standard." The Standard sets minimum requirements and permits engineering alternatives that demonstrate equivalent performance. It does not specify the particular analog to be used for the determinations a truss design program must make. Based on my education, training, experience in this industry, and my direct work on the Paragon software, selecting and validating those analogs requires professional engineering judgment. For the specific determinations that a truss design program must make, such as how to treat a heel joint, how much moment resistance a splice plate provides, how to analyze force transfer through stacked chords, how to evaluate a multiply girder connection across every load combination, engineering judgment is also required. TPI 1 provides general guidelines.

24.     **The plate manufacturers compete on engineering, not just on plates.** I attended WTCA Engineering Review Committee meetings in the 1990s at which engineers from the plate manufacturers, MiTek and Alpine, explicitly opposed standardizing the design analogs used in their software. Their position was that their engineering expertise gave them a competitive advantage that they were not willing to give up. The standardization did not happen. MiTek and Alpine each kept their own proprietary engineering analogs, developed through years of testing and analysis, and those analogs are not the same. I have personally run an identical truss configuration, same span, same pitch, same lumber species, grade, and size, same loading, through both MiTek and Alpine software and obtained different results: different member CSIs, different member deflections, different plate sizes. That difference is not error. It is a direct consequence of the different engineering judgments that each company's engineers used in the software their programmers built. Those judgments are not typically found in TPI 1. Paragon needed engineers

10

to make those decisions for its software. That is why all the plate manufacturers employ engineers on staff to develop their software, not just programmers.

25. **The engineering behind the Paragon software.** ██████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

███████████████████████████

████████████████

26. **Dan Holland's early tool (c.** ████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████

27. **The initial group meeting (c.** █████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

█████████████████████████████████

28. **Regular meetings throughout the partnership.** █████████████

████████████████████████████████████

██

29.  **Jeffrey Cox.** ████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████

30.  **How the partnership worked in practice.** ████████████████

████████████████████████████████  ██████████████

████████████████████████████  ████████████████████

████████████████████████████████  █████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████  ████████████████████████████████

31.  **Jeremy Bierema and Catherine Terrell.** ████████████████

████████████████████████████████████████

████████████████████████████████████

32.  **Heel joints and continuous-member treatment.** ██████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████

33.    **Splice joints and moment resistance.** ██████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████

34.    **Stacked chords.** ████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████

35.    **Multi-ply girder ply-to-ply connections.** ████████████

███████████████████████████████████████████████████

██

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████   ███████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████

36.    **Top Chord Bearing.** ████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████   ███████

████████████   ██████████████████████████████████████████

██████████████████████████████████████████████████████

█████████████████████████████████

37.    **ASCE 7 wind and snow loading.** ███████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████   █████████████████

████████████████████████████████   ███████████████████████

█████████████████████████

38.    **Compression joints and wood-to-wood bearing.** ██████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████   █████████████████

██████████████████████████████████████████████████████

██████████████████████████████

██

39.    **Why and when Joe Michels developed the spreadsheets.** ███████

████████████████████████████████████████████

██████████    █████████████████████████████████

████████████████████████████████████████████

███████████████████    ██████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████

40.    **What the Truss Joint Design spreadsheet contains.** ███████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████    ████████████

████████████████████████████████████████████

██

█████████████████████████████████████████████████████    ███████

█████████████████████████████████████████████████████████████████

██████████████████████████████████    ███████████████████████████

██████████████████████

41.    **How the spreadsheets were used in the partnership work.** ████████████

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

██████████████    █████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

██████████████████████████████

42.    **Documents provided to Paragon.** █████████████████████████    ████████

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████

43.    ████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

████████████████████████████    ██████████████████████████████████

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

████████████████████████████████████████████

█

44. Attached as **Exhibit 3** is a true and correct copy of an email from Daniel Lawless to Jeffrey Cox dated March 17, 2017 (QUALTIM-065714) and the written engineering document prepared in MathCAD attached to that email (QUALTIM-065715). I was copied on that email along with Joe Michels, John Holland, Kevin Muich, and Matthew Van Stelle. Lawless transmitted a revised document covering the same truss.

45. Attached as **Exhibit 4** is a true and correct copy of an email from Daniel Lawless to Jeffrey Cox dated May 25, 2017 (QUALTIM-065746) and the written engineering document prepared in MathCAD attached to that email (QUALTIM-065747). I was copied on that email along with Joe Michels. The subject line is ███████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████ our engineering judgment.

## THE ENGINEERING CONTRIBUTIONS

46. **Review of the contribution list.** I have reviewed the Defendants' Amended and Supplemented Answer to Revised Interrogatory No. 5, including supplements, which identifies sixty engineering contributions made to the Paragon software. I am identified as a contributor on



47.    **Composite Section and Stacked-Chord Engineering (Item 3).** ███

███

███

███

███

███

███

███

███

███

███

48.    ███

███

███

███

49.    ███

███

███

███

50.    ███

███

███



51.

52.

53.

54. **Responsible for the engineering.** During my involvement, the Qualtim engineers

held a firm line on the engineering. When the program produced a result the engineering did not

support, we identified it and Paragon corrected the code. We did not accept outputs that did not satisfy the engineering, and we re-checked after each correction. This mattered both to our professional engineering responsibilities and to the safe installation and performance of each engineered truss design.

55.    As licensed professional engineers, we were responsible for sealing the truss designs produced by the Paragon software for Clearspan and others. Under our professional licensing obligations, we could not seal designs produced by software unless the engineering underlying that software met our standards. That was the position our team maintained throughout the work.

56.    **The engineering was treated as confidential and proprietary.** From the beginning of the partnership work, the engineering the Qualtim companies were contributing was treated as confidential and proprietary to the Qualtim companies. Kirk Grundahl stated at the initial group meeting, and I understood throughout, that the engineering information we were providing was the Qualtim companies' own intellectual property. The spreadsheets were not shared generally with the industry. The engineering documents we prepared, and the analyses and worked examples in them, were not disclosed publicly or to anyone outside the confidential partnership relationship. I also understood from my participation at meetings and discussions with Kirk Grundahl that the Qualtim companies and their employees were to keep our engineering work confidential within the partnership.

57.    Throughout my involvement, no one ever asked me to sign, and I never signed, any agreement assigning or transferring that engineering work to Paragon, and I was not employed by or compensated by Paragon for it. At some point, and without advance notice to me, Paragon

20

terminated our access to the software. When it did, the engineering our team had independently developed and contributed to the partnership remained in that software.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on the 21st day of July 2026, at Mount Horeb, Wisconsin.

_____
James Vogt

21